**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRYAN MERCER, CANDACE McKINLEY, SHANEE GARNER-NELSON, ADAM BUTLER,<br><br>                  Plaintiffs,<br><br>    v. | Civil Action |
| KEVIN JACKSON, THE BLACK SPHERE, LLC, and MABIE MARKETING, INC, d/b/a The Campaign Solutions Group | No. 2:20-cv-00098-JMG |
|                   Defendants. | **Jury Trial Demanded** |

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

### I.      Preliminary Statement

1.     Plaintiffs are four of the 123,848 residents of Philadelphia who, during several evenings in September 2019, were subjected to identical text messages on their personal cellphones. They were targeted for these privacy intrusions by the Defendants solely because they were believed to be African Americans who were registered Democrats or Independents residing in Philadelphia.

2.     The Defendants are: Kevin Jackson, a right-wing provocateur and former Fox News contributor; Jackson's wholly owned limited liability company, The Black Sphere, LLC, a commercial operation through which he promotes his books and a radio show; and Mabie Marketing, Inc., d/b/a The Campaign Solutions Group and d/b/a California Marketing Group, the California-based marketing firm that initiated those tens of thousands of identical text messages on Jackson's behalf.

3.     These uniform text messages, which were designed to appear to be initiating a two-way communication on issues of public importance, were, in actuality, one-way communications designed to elicit personal information for use in promoting Defendants' purported expertise and value to political campaigns.

4.     Plaintiffs bring this action, individually and on behalf of a class of similarly situated individuals, under the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(C), and the regulations promulgated thereunder (hereinafter referred to collectively as "TCPA"), and under the common law of Pennsylvania. They are acting on behalf of all the persons who received these same, pre-recorded, text messages. Plaintiffs seek actual and statutory damages for themselves and the class, as well as injunctive relief against similar future intrusions.

## II.     Jurisdiction and Venue

5.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiffs' claims under the Telephone Consumer Protection Act (TCPA). *Mims v. Arrow Fin. Servs., L.L.C.,* 565 U.S. 368 (2012).

6.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' state law claim in that this claim is so related to the TCPA claims that it forms a part of the same case or controversy.

7.     Venue in this Court is proper under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III.     The Parties

8.     Plaintiff Bryan Mercer is an adult individual who lives and votes in Philadelphia, Pennsylvania.

9.     Plaintiff Candace McKinley is an adult individual who lives and votes in Philadelphia, Pennsylvania.

10.    Plaintiff Shanee Garner-Nelson is an adult individual who lives and votes in the Philadelphia, Pennsylvania.

11.    Plaintiff Adam Butler is an adult individual who lives and votes in Philadelphia, Pennsylvania.

12.    Defendant Kevin Jackson is an adult individual residing in Maricopa County, Arizona.

13.    Defendant The Black Sphere, LLC is a Missouri limited liability company owned by Defendant Jackson and through which he conducts his business.

14.    Defendant Mabie Marketing, Inc. is corporation located in San Diego, California that does business in the name of The Campaign Solutions Group. It also does business in the name of California Marketing Group. This Defendant will be referred to hereafter as "TCSG."

## IV.    The Facts

15.    Between September 10-13, 2019, Defendant Mabie Marketing, Inc. sent 123,848 text messages to Philadelphia residents.

16.    The text messages sent consisted of two pre-recorded messages, with roughly one half of the 123,848 recipients receiving one (Message No. 1) and the other half receiving the other (Message No. 2).

17.    Message No. 1 was as follows:

**Is CRIMINAL JUSTICE REFORM in Philadelphia important to you?**
**Please reply "YES" to have your voice heard. (feel free to text comments also)**

**Reply STOP to opt-out.**

**Thank you! – "Research for Racial Justice"**

18.     Message No. 2 was as follows:

**Philadelphia courts are soft on illegal immigrants and hard on African Americans. Let's push back on City Hall.**

**To learn about our DISCRIMINATION lawsuit tap this link: http://rtxt.co/6n6d**

**Reply "YES" to have your voice heard. Interested? …**

**Reply "STOP" to opt-out.**

19.     Plaintiff Mercer received Message No. 2 on his personal cellphone at approximately 9:05 pm EST on September 11, 2019.

20.     Plaintiff Candace McKinley received Message No. 1 on her personal cellphone at approximately 10:19 pm EST on September 11, 2019.

21.     Plaintiff Shanee Garner-Nelson received Message No. 2 on her personal cellphone at approximately 10:45 pm EST on September 11, 2019.

22.     Plaintiff Adam Butler received Message No. 2 on his personal cellphone at approximately 8:20 pm EST on September 11, 2019.

23.     Defendants Kevin Jackson and The Black Sphere, LLC hired Defendant TCSG to send these 123,848 text messages.

24.     The messages were sent to individuals the Defendants believed to be African Americans voters in Philadelphia who were registered either as Democrat or Independent who made less than $100,000 per year. Defendants purchased a data file from a third-party data vendor that purported to provide the names and cell phone numbers of individuals who met these criteria. Defendants paid per phone number for this file of designated names and cell phone numbers.

5

25. Unbeknownst to the recipients of these text messages, the purpose of this mass texting campaign was not to communicate with the recipients, but rather, was to induce them to send replies, all of which were collected and classified by the Defendants, for their use in planning future, subsequent privacy intrusions targeting African American voters.

26. Defendant Jackson is a right-wing provocateur who promotes himself through his "The Black Sphere" website, his Kevin Jackson Radio broadcasts and his books ("Race Pimping"). He was a frequent contributor on Fox News until being fired in 2018 for his tweets that referred to the female accuser in the United States Senate confirmation hearings of Justice Brett Kavanaugh as a "lying skank" who should stop "opening her legs."

27. Jackson hired TCSG for the purpose of creating a kind of voter response "study" that would enable him to promote himself to potential funders as having a unique ability to "engage" African American voters and convert them to vote for Donald Trump in the upcoming election. Jackson convinced a wealthy Republican donor to fund this "study."

28. For its part, TCSG is a voter-contact campaign that offers call-center services to political campaigns. In traditional voter engagement services, unlike what happened here, a real person communicates with a targeted voter in a two-way telephone conversation, either for polling or get-out-the-vote purposes.

29. Although TCSG promoted itself to Jackson as being expert in the field of political text messaging and as being willing to execute the mass texting program he was contemplating, in fact, TCSG had virtually no such prior experience specific to texting voter cell phones.

30. Once being hired by Jackson, TCSG purchased the said cellphone data file with the intention of sending the texts at issue in this case.

31.     In Pennsylvania, the personal information contained in voter registration applications may be acquired for use by a political campaign. However, it is unlawful to use such information for the commercial purpose of gathering data to support future promotional pitches to political campaigns. *See* 25 Pa. Stat. and Cons. Stat. Ann. § 1207 ("The material may not be used for commercial or improper purposes.").

32.     TCSG hired a third-party vendor, Political Social Media, LLC, which owns a texting application RumbleUp, to provide the technological infrastructure necessary for the Jackson project. The application is designed so that after an individual user downloads the application and logs into their account, the application populates their cell phone with the pre-recorded text message and with a recipient's cell phone number automatically pulled from a list of numbers pre-stored on the application's central database.

33.     TCSG gave this company the cellphone file it had purchased and the two, pre-recorded text messages to be transmitted.

34.     TCSG then organized a group of employees who, using their own cellphones, would be able to open the text-message application and begin sending the Jackson text messages. The pre-recorded message and the number to be called would automatically appear on the user's screen and the user would then only have to push SEND to transmit the text message. Once the message was sent, the next text phone number would automatically appear, ready for the next push of the SEND button.

35.     TCSG paid its employees per text message, meaning that it rewarded them for the speed with which these identical text messages could be sent to the automatically selected phone numbers, even allowing them to use two cellphones at the same time, as they pushed these

communications, originating from their California location, in a kind of rapid fire, onto the designated cell phones in Philadelphia.

36.     The text messages were not the two-way communications they appeared to be. When recipients received the intended text messages, the phone number appearing on the text was not the number of the TCSG employee who actually sent the message, but rather, was one of several numbers—(833) 910-0620, (888) 270-9362, (833) 830-9908. These numbers had two functions. First, they masked the identity of the actual senders of the text messages. And second, they provided a return number so that when a recipient responded to the text, that response would automatically be collected and stored in a centralized data file. This application was not setup so that at any point the sender of the text message would see or be able to respond to a recipient's response to the initial text message.

37.     TCSG tasked its employees to start blasting the text messages in the late afternoon, which, on account of the three-time-zone difference, meant that the recipients in Philadelphia received these 123,848 texts from the early evening into all hours of the night.

38.     Besides the fact that these unconsented text messages arrived frequently at inconvenient, if not, disturbing times, and were sent by people who were not in fact disclosed or accessible to the recipients, the content of these texts was highly deceptive.

39.     Message No. 1 appeared to be an invitation from an organization named "Research for Racial Justice" to express views about "Criminal Justice reform in Philadelphia." In fact, there is no such organization and virtually any reply that reacted substantively to the topic, no matter its content, would be reported to Jackson's wealthy funder as evidence of African American "engagement," which could warrant additional, deceptive communications to

that person. Moreover, had Jackson's identity and his actual views and purposes been disclosed, it is highly unlikely that he would have been able to induce any responses other than angry ones.

40.     Message No. 2, which stated as a fact that Philadelphia courts are "soft" on illegal immigrants and "hard" on African Americans, invited the recipient to visit a website to learn about "our discrimination lawsuit." In fact, there is not now and never was such a lawsuit. A visit to the linked website—http://criminaljusticereform.org/philly—suggests that Jackson may have been planning a sham legal action as a publicity stunt and was actually fishing for potential plaintiffs for a frivolous suit.

41.     The vast majority of the text-message recipients did not reply to Defendants' messages. However, those recipients who were induced to reply would have no way of knowing that Defendants would be collecting and categorizing any responses that were made, subjecting them to the threat of further, future communications, nor would they know that their responses would become the objects of mockery between the Defendants.

## V.     Class Action Allegations

42.     Plaintiffs seek to represent the following class ("the Class"):

The 123,848 individuals who received one of the two form text messages transmitted by the Defendants during the period September 10-13, 2019.

43.     **Numerosity.  FED. R. CIV. P. 23(a)(1).**  The Class is so numerous that joinder of each of the 123,848 individuals is impractical. All of those individuals are ascertainable—including their cellphone numbers, if not their addresses—from a data file in the possession of the Defendants.

44.     **Existence and Predominance of Common Questions of Law and Fact.  FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class. Without limitation, these common questions of law and fact include:

(i) whether Defendants are subject to the TCPA;

(ii) whether Defendants used an "automatic telephone dialing system" or "an artificial or prerecorded voice," as referred to in 47 U.S.C. §§ 227(b)(1)(A) and interpreted by the FCC regulations issued thereunder;

(iii) whether Defendants willfully or knowingly violated the TCPA;

(iv) whether Defendants' text message campaign invaded a legally protected privacy interest of class members, whether their expectation of privacy was reasonable and whether the intrusion was sufficiently serious in nature and scope to constitute an egregious breach of social norms; and

(v) whether the members of the Class are entitled to damages, and, if so, how much.

45.     **Typicality. FED. R. CIV. P. 23(a)(3)**.  Plaintiffs' claims are typical of the claims of each Class member.  They have the same claims for damages that they seek for absent class members.

46.     **Adequacy. FED. R. CIV. P. 23(a)(4).**  Plaintiffs are adequate representatives of the Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously.  Plaintiffs and their Counsel will fairly and adequately protect the interests of members of the Class.

47.     **Superiority and predominance.  FED. R. CIV. P. 23(b)(3).**  Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action would be superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member can be determined on a class-wide basis and are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class themselves could afford such individual

10

litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

## VI.    Claims for Relief

### COUNT ONE—TCPA

48.    Under 47 U.S.C. § 227(b)(1)(A)(iii), it is unlawful for any person to "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . " to a cellphone.

49.    Although the prohibition in 47 U.S.C. § 227(b)(1)(A)(iii) applies to a prohibited "call," the FCC, by regulation has determined that the term "call" encompasses text messages, FCC 03-153, Report and Order adopted June 26, 2003, which determination has been adopted by the courts. *See, e.g.,* Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 269 (3d Cir. 2013).

50.    The text messages at issue were sent by an "automatic telephone dialing system" in that Defendants used equipment which has the capacity to store cellphone numbers to be texted, and, using a random or sequential number generator, to dial/transmit the texts to those numbers.

51.    The text messages were transmitted without the prior express consent of Plaintiffs or the Class Members, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

52.    In sending these unauthorized and illegal text messages, Defendants acted willfully or knowingly.

53.     Plaintiffs and Class Members have each suffered an invasion of privacy from which Congress sought to protect them.

54.     Pursuant to 47 U.S.C. § 227(b)(3), Plaintiffs seek for themselves and for each Class Member the following relief:  $1,500 per Class Member for this deliberate, mass invasion of privacy, including the discretionary damage multiplier authorized when a defendant acts willfully or knowingly; and injunctive relief prohibiting Defendant from any further violations of the TCPA.

COUNT TWO—TCPA

55.     Under 47 U.S.C. § 227(b)(1)(A)(iii), it is also unlawful for any person to "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice" to a cellphone.

56.     The SMS equivalent to a "prerecorded voice" is a prerecorded text message. Given that the statutory term "call" encompasses communications sent via SMS as well as by voice, the prohibition in 47 U.S.C. § 227(b)(1)(A)(iii) includes both prerecorded voice calls *and* prerecorded text messages made to a cell phone. *See* 2003 FCC Report and Order, Para. 165 ("We affirm that under the TCPA, it is unlawful to make any call using an automatic telephone dialing system or an artificial or prerecorded *message* to any wireless telephone number.") (emphasis added).

57.     The mass text message campaign initiated by Defendants utilized two prerecorded messages stored in a central database and prepopulated without modification in senders' text messages.

58.     The text messages were transmitted without the prior express consent of Plaintiffs or the Class Members, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

59.     In sending these unauthorized and illegal text messages, Defendants acted willfully or knowingly.

60.     Plaintiffs and Class Members have each suffered an invasion of privacy from which Congress sought to protect them.

61.     Pursuant to 47 U.S.C. § 227(b)(3), Plaintiffs seek for themselves and for each Class Member the following relief:  $1,500 per Class Member for this deliberate, mass invasion of privacy, including the discretionary damage multiplier authorized when a defendant acts willfully or knowingly; and injunctive relief prohibiting Defendant from any further violations of the TCPA.

### COUNT THREE—Pennsylvania Tort of Intrusion upon Seclusion

62.     The text message campaign to which Defendants subjected the members of the Class was a deliberate and intentional act, in that Defendants purchased a list of private cellphone numbers with the intention of sending a prerecorded, form text message to each of those numbers, and the employees who pushed SEND repeatedly did so with the intent, in each case, of causing a text message to intrude the recipient's privacy at the hour on the East Coast when the SEND button was pushed.

63.     Pennsylvania law further recognizes that Pennsylvanians have a reasonable expectation of privacy in their personal information related to them as voters.  *See* 25 Pa. Stat. and Cons. Stat. Ann. § 1207 ("The material may not be used for commercial or improper purposes.")

64.     This deliberate, systematic and widespread invasion of privacy, targeted to what Defendants believed to be African American, Democratic or Independent voters who made less than $100,000 per year in Philadelphia, constituted a highly offensive breach of acceptable social

norms in that a reasonable person with ordinary sensibilities who was subjected to this intrusion and aware of all relevant facts would suffer mental distress, shame or humiliation, in that, among other reasons:

a. The communication was not targeted anonymously or randomly but, rather, in actuality was targeted to specific persons whose private cellphone numbers had been purchased by Defendants;

b. It was a one-way communication masquerading as two-way;

c. The communication was fraudulent in that it was not intended to begin a genuine conversation, but rather was a duplicitous communication designed to extract personal information;

d. It was a communication from an undisclosed person whose actual views and purposes, if known, would likely be regarded as offensive by a typical member of the Class;

e. Many or most of the messages were received at unreasonable, late-evening hours;

f. After collecting the verbatim responses sent by Class Members, Defendants coded many of these responses in a manner that members of the Class would likely consider offensive and in direct contravention of their actual opinions;

g. Defendants subjected many of Defendants to mockery based on their responses; and

h. Defendants' use of the personal information of Pennsylvania voters for this fraudulent and deceptive privacy invasion was unlawful. *See* 25 Pa. Stat. and Cons. Stat. Ann. § 1207 ("The material may not be used for commercial or improper purposes.")

65.     Plaintiffs and the Class seek damages under the common law tort of intrusion upon seclusion.

WHEREFORE, Plaintiffs seek damages for themselves and the Class; injunctive relief under the TCPA protecting them from further violations; and any other such relief deemed appropriate by the Court

Dated:  June 4, 2020

/s/ Irv Ackelsberg
Irv Ackelsberg
David A. Nagdeman
LANGER, GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tele: (215) 320-5660

James A. Francis
David A.Searles
FRANCIS MAILMAN SOUMILAS, PC
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel: (215) 735-8600

Attorneys for the Plaintiffs